Good morning ladies and gentlemen. Our first case for argument is Thorncreek Apartments against Mick. Mr. Hardigan. Good morning. My name is Michael Hardigan. I'm here on behalf of the Village of Park Forest and Village Manager Tom Mick. May it please the court. Counsel, despite 10 years of litigation and never being before the appellate court on any issues, I've managed to identify only two issues for appeal here today. I technically identified three, but technically the first two are one. And I want to talk about the first issue, which was Judge Feinerman's award of prejudgment interest. It's kind of an interesting issue because there isn't much case law, if any, in this circuit where prejudgment interest is awarded in a Section 1983 action. Here we have three corporate plaintiffs, three LLCs from the state of Michigan who were the party plaintiffs. And in this case, which went to trial in April of 2014, plaintiffs identified a damages expert witness named Thomas Frizee, who offered testimony regarding the damages sustained by each of the three Thorncreek entities. Those entities are known as Areas F, G, and H. The only entity that received prejudgment interest was Area G. So I'd like us to focus on that only. Mr. Frizee testified that these parties sustained damages in the form of improvement costs, in other words, the village forced them to improve the properties which they considered a damage, operating expenses is what they called them, as well as a lost sale opportunity and other capital expenses. But one of the line items that was proposed, which was submitted to the jury, was prejudgment interest. And each entity had a certain amount as to each. And those tables were discussed at length during the testimony offered by Mr. Frizee. So I identify in my brief where Mr. Frizee testified regarding prejudgment interest, and at the end of Mr. Frizee's testimony, counsel for Thorncreek offered into evidence these three tables for Areas F, G, and H, to which there was no objection. So these three tables were not only testified to by Mr. Frizee, but they were offered into evidence. So the jury took those tables back with them to deliberate. And so we were then faced with a post-trial motion filed by Thorncreek requesting prejudgment interest. So we naturally said, well, wait a minute, you asked for that from the jury, now you're asking that from the judge. So we obviously vigorously opposed that request, which obviously was denied. Judge Feinerman awarded $501,032.88 in prejudgment interest, again, to only Area G, based upon calculations from early 2008 to the date of judgment, which was April 2014. So we cite in our post-trial motion in opposition to that request the case of Raybestos v. Younger, which we believe is very instructive here and which we also respectfully believe Judge Feinerman didn't give enough attention to. In Raybestos, the plaintiff received a compensatory damages verdict of $2 million, just like our plaintiff in Area G, and they had also requested prejudgment interest from their damages expert, just like Thorncreek did here. Plaintiffs thereafter filed a post-trial motion requesting, among other things, prejudgment interest, and they were similarly successful, and they were awarded $495,000. So very similar amounts, very similar facts. And on appeal, the defendants argued that the award of prejudgment interest should not have been awarded because the general verdict, which was proffered by the plaintiffs, the same thing that happened here, could have included prejudgment interest. And if there's any confusion in this regard, that confusion must be borne by the party requesting it. So they argued that the interest award was an abuse of discretion, which is the standard that applies here. We acknowledge that. This court agreed with the defendant's position and held, and I quote, fairness dictates that the party seeking prejudgment interest must shoulder the consequences of the confusion and uncertainty surrounding the award of prejudgment interest. This is because prejudgment interest is designed to fully compensate the injured, not to penalize the party causing injury. Here we certainly are of the mind that a half a million dollar award in prejudgment interest is a penalty. And moreover, this court held, and this I believe is most important, quote, plaintiff cannot recover prejudgment interest twice. Because Ray Best has provided the jury with damages figures that included interest estimates, we will presume that the jury's award included an interest augmentation. Accordingly, the subsequent award of prejudgment interest constituted an unauthorized doubling of damages. And thus the district court's amended judgment as to the prejudgment interest must be vacated. That presumption can be overcome. And the district court here, you know, tackled that issue and said it was overcome because the jury's award didn't track what was requested. It just sort of was a mathematical calculation. Right. And Judge Sykes, I certainly want to discuss that in a second. And I want to apply Ray Best to this case. So again, there's no dispute that this was requested from the jury. I mean, that was acknowledged by Thorn Creek in their brief and acknowledged by the district court. Tables again were admitted into evidence. And then the jury arrived at a general verdict of $2,014,000. Not a round number, right? An odd number. A number that, frankly, both sides and the district court struggled to understand. So all the parties engaged in post-trial speculation as to how the jury arrived at this award. So to answer your question, Judge, our expert, Michael Pachter, was of a position that Thorn Creek sustained no damages. A risky position to take, as we fully acknowledge. But that was our position. And evidently, the jury believed him, at least with respect to Area F and H, each of which received $1 nominal damages awards. But to suggest that the jury completely disregarded Mr. Frazee's calculations is belied by the verdict itself. They must have embraced at least some of it because if they hadn't, they would have awarded $1 to Area G. At least that's our logic. So the district court and plaintiff's counsel are of a mind that what the jury simply did is take the appraisal for Area G, which is around $10,000,000, $10,000,000,120, and subtracted the mortgage debt. No, I think you're ignoring the general understanding of how juries are entitled to operate. It's not a binary choice, to use a phrase that's very common these days. They don't have to pick the plaintiff's version of the damages estimate or the defendant's version of the damages expert. They can come up with their own calculus. And what they did is a very common sense measure here, or at least this is what I read Judge Feinerman's order to conclude. They took the value of the property and subtracted the mortgage debt and said that's the damages. Once they found liability on that Area G part of the package. It doesn't come to that amount though, Judge, believe me. If the numbers added up to $2,014,000, that would have been identified. The appraisal of $2,001,200 less the mortgage of $9,000,000, it comes out to about $850,000. Or there's another number in the foreclosure complaint of just the P&I principal and interest of $8.5 million. That comes to $1.5 million. And the third option was there was a person that was identified as an interested buyer in Area G. His name was Richard Sharp. He never actually testified. It was our position he was just a straw man who was put up to say he was interested in buying the property. But there was a purchase agreement where he agreed, or he was going to, pay $11 million to purchase the property. Judge Feinerman cites document 383 at 15 and document 406 at 14 for this understanding of the jury's verdict. I didn't go back and look at what those documents are. What are those documents? I believe, I can't speak to that right now, Judge. I don't have that in front of me. But what he, actually I can't speak to that. We said that is one possibility as to how the jury arrived at their verdict, which was to again subtract the mortgage debt from the appraisal. But again, that doesn't come to $2 million, $2,014,000. So we said that's certainly one possibility, but it's not that number. And so there must have been some calculations performed in the jury box. And really, Judge, I think we're getting in the weeds because prejudgment interest was requested from the jury. It could have been requested only from the judge. It was requested from both. And I frankly don't think that Raybestos is any different than this case where Thorn Creek acknowledged that there was indeed confusion generated by the verdict form, but that verdict form was proffered by the district court after it received a 60-page verdict form from Thorn Creek, which the court rejected immediately, saying it's confusing not only to the court, but it will be confusing to the jury. So the court did what I thought was a commendable job in culling down the verdict form to what it was. And now for Thorn Creek to say, well, yeah, there was confusion, but it's not our fault. It's the district court's fault. I just don't think that's good form. So there's an acknowledgment that prejudgment interest was requested twice. There's an acknowledgment that confusion was generated by the verdict form, and there was no objection to the verdict form. So again, this is spot on with Raybestos. I think it's actually the best case we could have possibly had in support of this argument that the judge abused his discretion in awarding over a half a million dollars to Area G in this matter. And we may never, we'll never know whether or not prejudgment interest was included in that number, because we were properly instructed not to, of course, question the jury on that. So the fact that we're still debating how they arrived at that number to this very day suggests that that amount should be vacated, as it may very well have been included prejudgment interest. So our second issue on appeal, I'll try to get through this quickly. I want to reserve the rest of my time for response to plaintiff's arguments and rebuttal. I know I've got about 15 minutes, so I'll get to it. It's a little easier, at least I think. It deals with a Rule 50b motion for judgment as a matter of law as to Tom Mick, the village manager. At the conclusion of this trial, Tom Mick, who's the village manager, and Larry Crestes, who's essentially his right-hand man in the form of the director of the building department and community development, those two gentlemen were found liable for conspiracy, 1985-3. And we filed a motion attacking that finding, not only that finding, but the punitive damages awards against each of them. Tom Mick was assessed $5,000, and that conspiracy claim must fail because Thorn Creek presented two equal protection claims, the first of which was a race-based claim. I don't understand the nature of this argument. When all the defendants are state actors, 1983 and 1985-3 come to the same thing. So what difference would it make if one said, ignore 1985-3? 1983 remains, and the jury did return its verdict. Judge, I think you authored the opinion regarding... It doesn't make the smallest difference who signs an opinion for the court. Opinions speak for the court, not for their author. And I believe in the Fairley v. Andrews decision, which if I'm not mistaken you authored, 1985-3 adds... Counsel, I have just told you that it doesn't make any difference who signed the opinion of the court. And to have you then make an ad hominem argument after having been so reminded is, well, troubling. I apologize, Judge. So the 1985-3 claim was against Tom Mick and Larry Kressley, and Judge Feinerman vacated the finding as to Tom Mick only because the indispensable predicate did not exist, and that indispensable predicate was either a race-based or class-based... I wish you'd address my question. What difference does it make? The jury returned verdicts under both 1983 and 1985-3. They come to the very same thing when there are public officials involved. So why should it make any difference in this case? Well, plaintiffs submitted a verdict. You are thinking of claims as particular statutes. Under the federal rules, a claim is a grievance. One doesn't plead law. The verdict form should not have separated different legal theories. The judge should tell the jury about the claims and ask for the jury's decision about those claims under the legal standards provided by the court. The idea of telling juries about which statute supports which theory is wrong. But in any event, my question is, what difference does it make? Because when public officials are the defendants, both statutes cover the same ground. Well, 1985 deals with conspiracy, specific conspiracy to deprive plaintiffs of their civil rights, Judge. And the judge, Judge Feinerman, properly dismissed out the 1985-3 claim as to Tom Mick, saying there was no... I wish you'd deal with my question. Maybe I can't answer it as you'd like, Judge, but that's how the record played out. Those were the claims that were adduced by the plaintiffs and which were attacked by us? They aren't claims. They are legal theories. Legal theories and claims are different. That's why the Supreme Court has held that one doesn't plead law. And there shouldn't be jury instructions that talk about law. Now, maybe you would say the plaintiffs have waived this problem or forfeited it. But I don't understand why a jury would ever be told that there are particular legal cubbyholes rather than claims. And I don't understand why when two statutes cover the very same ground, it helps any litigant to knock out one of the two statutes, because the other one is left. You're in your rebuttal time. Oh, I know, Judge. Well, I don't know what to say. I mean, there was a 1983 claim brought... They are not separate claims. They are different legal theories in support of a single claim. Well, okay. Well... You need to think of claims the way the Supreme Court and the federal rules think of claims. That's the problem here. Well, we're respectfully requesting that this Court do the same that Judge Feinerman did, which was to vacate the finding against Tom Mick as he can't conspire alone. And the resultant $5,000 punitive damage award, which we respectfully submit, was awarded in conjunction with the conspiracy finding. If it were awarded in conjunction with the Class I finding for $2 million, the punitive damage award would have been far more. And so it's our position that that certainly was awarded in conjunction with the conspiracy finding, which I understand is not a separate claim, but that's the way it was brought to the jury, and that's the way we're proceeding. Thank you, Judge. Judges? Mr. McCullough. Good morning, Your Honor. Your Honors. Andrew Mojavel-Chapurian on behalf of the plaintiffs, Thorn Creek, Town Homes, Roman numeral 1, Roman numeral 2, and Roman numeral 3. There are a number of arguments to address briefly, counsel's argument, before getting to my own. We believe that Judge Feinerman recognized that, in fact, there were multiple alternative theories with respect to damages that were presented to the jury. Yes. Did you propose this jury verdict that segregated by statutory citation? We did not, Your Honor. Did you object to it? The court, we presented, the court asked us to present it. No, that's a simple question. Did you object to it? We objected that there was a, that they weren't the forms that we had presented. No, that's not the question I asked. Did you object, tell the district court that the jury verdict should not have separate verdicts per statutory subsection? I don't recall whether we specifically objected to that. With respect to the prejudgment interest, I believe that the court recognized, I believe the jury recognized that the calculations that were presented by our expert, Mr. Frizee, were not adopted. Instead, the alternative calculations that were presented by the mortgage servicer in the foreclosure were in fact adopted. There was specifically a foreclosure document that was submitted that indicated right before the foreclosure, and the foreclosure is the damage that occurred in this case, that presented an appraisal amount and also the mortgage amount, and the jury, at least with respect to the area G, in fact subtracted one from the other, and I believe that the court recognized that. I believe the court also recognized that that was one of the theories that the defendants recognized in pleadings, post-trial pleadings, that were identified as a plausible means as to how the jury arrived at their verdict. As a result, I believe given the case law that provides particularly a presumption in favor of violations of prejudgment of interest, whether there are violations of federal law, and... Does the jury's calculation, assuming that's what it did, subtract from the appraised value the outstanding mortgage amount? Does it conform to the evidence? It does, in fact a specific document with respect to the evidence, and jumping ahead, that in fact forms the basis for our argument with respect to that verdict with respect to areas F and H, particularly H, were against the great weight of the evidence. The evidence that was presented with respect to those properties, G and H, was identical. It was the exact same form that was presented by the foreclosing company, actually the servicer, Wachovia, on behalf of the servicing, on behalf of the mortgage company, and it provided the exact same CBRE appraisal amount, and it would have resulted, should have resulted in a $3.1 million verdict in favor of H would have been consistent with G. By way of background, I sort of identify what these properties and what this village looks like. The village of Park Forest was a government-sponsored project that was built to prepare housing for servicemen returning from World War II, and so what you have is multiple apartment townhomes that are identical in size, the same architecture, that were prepared around a small city center, and they're all built at the same time. But they are divided into different areas, and after a period of time they were sold to private individuals. Areas G, H, and F, other than minor cosmetic differences, are identical. They're identical in structure, they're identical because they were prepared and they were built at the same time by the government in terms of preparing housing. As a backdrop in presenting damages, I think it's important to note that the properties are identical. They're situated in an identical fashion. There are some cosmetic differences, but the differences are explained in the appraisal form in the foreclosure notice that was presented by the servicer, a third party, and we believe that it was against the great way of evidence that where the jury determined and the court recognized determined that the damages with respect to G were proven to be the difference between the appraisal amount and the mortgage amount at the time of foreclosure, which was a damage of $2 million, that the exact same form, the exact same damages that was presented with respect to H should have been adopted as well. The case law that I've reviewed with respect to nominal verdicts is where there's finding of liability, but there's no damages proven. Here we have the identical set of damages proven in an identical fashion. Well, the district judge did write quite a long opinion explaining why he thought that was wrong, but I have a procedural question that comes ahead of that, I think. Did you ask that the jury be told that its verdicts are inconsistent and be told it should deliberate some more? We did not. That's what's supposed to happen in civil cases, and if you don't ask, why should we bail you out on appeal? I believe in whether there was an opportunity to present that before the court, and we did not. There has to be an opportunity. There's an opportunity to poll the jury, there's an opportunity to make any requests to the judge before the jury is disbanded. I understand your point. I didn't see in your brief a contention that you wanted to make such a request, but the district judge wouldn't let you. I don't believe we made such a contention. No. If I could address, in terms of Judge Feinerman's opinion on our Rule 59 motion, there's essentially one line that he spends on Area H. It says based on evidence presented at trial, the jury reasonably could have determined that the villages enacting and enforcing the electric ordinance was the only conduct that actually harmed Thorn Creek, and Area H was not harmed because it had already received the required updates. The difficulty we had with that, the judge's reasoning on that point was that the liability, that's an issue of liability. If G had been the only one because of the difference in electric ordinance that had been denied a business license, then based on that factor, there would have been no finding of liability on H or F, but in fact there was a finding of liability. There is a particular issue, and as I prepared for our argument today, as I thought about this issue, I recalled that because there were Monell claims in this case, Judge Feinerman separated and had the parties agree that certain actors on behalf of the village would be designated for purposes of the trial and to inform the jury as policy makers for particular actions. Larry Karestas was the building department supervisor and responsible for electric. The jury was told that he was responsible for building and electric. Tom Mick was designated as the policy maker under Monell for the business license. The fact that the jury returned a verdict against Tom Mick for violation of equal protection could only, because he was the policy maker, it only makes sense that it was related to the issuance of the business license because that's what he was a policy maker for. If, in fact, it was the business license and not the electric, which the court reasoned it was, it doesn't support that there would have been a finding of liability with respect to each, and G is awarded an amount of money. So the question is why did they do that? We argued that the court, that the defense counsel introduced statements and which inflamed the jury and inflamed their passion and caused them to want to minimize the damages, notwithstanding the fact that the proofs were the same. It's important in context, and again in preparing for argument, I wondered whether it was as close to me because I participated in the trial as somebody else reading this from afar, but there were two different motions in limine, two different evidentiary issues that were in conflict and essentially fighting each other during this trial. A matter of weeks, even though the discovery had been closed for three years, a matter of weeks before the trial the judge changed the rules on us. He said that he was going to allow the defendants to supplement their evidence and introduce documents from pre-2005, and their argument was that they wanted to introduce a flow of funds argument, that the properties had not been maintained and that was the reason for the foreclosure, and the court denied that motion. We raised it again in a motion in limine and the court said no, they're going to be allowed to bring in the flow of funds argument, and what they wanted to do was to bring in documentation showing that in 2004 that the properties were refinanced and $16 million of proceeds was received at the time of that refinancing. They then used that to circumvent the court's ruling with respect to wealth. There were some overt rulings with respect to wealth, the mention of a telephone call that was obviously prepared by counsel in preparation to a third trial, where the plaintiff's principal was blurting out that he was on his boat in the Mediterranean. That's an overt comment, but that's not what permeated this trial. What occurred was that this flow of funds argument, which the court allowed and denied our motion in limine, that that flow of funds argument was then used to not show that capital improvements were not made, there was no testimony at all in that respect, but rather that the cause of the foreclosure, which was the damage, was the wealth. In context, the flow of funds argument went to causation. The reason why Mr. Packard, the defendant's expert, testified that there was no damage, went to the flow of funds argument. He was arguing liability. The cause was the lack of capital investment that caused this foreclosure, but the jury didn't find that. The jury found liability. The jury found that the lack of the business licenses and the issuance of the business licenses is what caused this foreclosure, which caused this damage. As a result, the flow of funds argument, which the only thing they pulled out was the refinance and the $16 million, and there's millionaires, and he's referring to Mr. Clapper as a financial genius, and things that permeated the trial. It wasn't just a single event. It just permeated the trial, and when we tried to address it, we were rebuffed based on the court's prior definitive ruling that this was part of the trial. Backtracking just a little bit, one of the things that concerned us when this flow of funds, once we received the supplement, I think it was about two months before the trial, in the supplement, we filed a motion to strike saying it's way too late. You can't amend your expert report less than 90 days before the trial. It's way too late, and judge says they're trying to introduce wealth through this flow of funds argument because that's what they want to get. Defendant's counsel represented, and I participated by telephone at this conference, a motion hearing, that we had, that they had requested it in discovery and we never presented it. Prior, when we arrived for the final pretrial before the court, that in fact the instructions with respect to, I'm sorry, the representation that we hadn't responded, we gave the actual document request, and in fact we had responded. The court, however, then dismissed that and said no, that's a harmless error. I'm going to allow this to happen. So you have this tension between wealth and the court's definitive ruling that wealth was not supposed to be introduced and defense counsel's ability to circumvent that ruling through this so-called flow of funds argument, but the jury didn't buy the flow of funds argument, even if it was appropriate. It went to liability. It was the cause for the foreclosure was the lack of investment. That was the argument. They found liability. So if you look at the verdict form, it's inconsistent, particularly where there was an award of G and they adopted the foreclosure letter, the foreclosure statement from Wachovia through their own appraisal of what the dollar amounts were as to Area G, but then gave nominal damages as to F and H, when in fact there was not only proof submitted making nominal damages inappropriate, but specific proof with respect to the damage that was adopted and the court recognized was adopted as the Area G. Didn't the sale of Area F predate the whole zoning struggle that is the gravamen of the claim here? What occurred is that Area F for a period of time struggled to refinance, struggled, and counsel for the village at that time, a gentleman by the name of, I believe, Jermboe that afterwards left to, I think he's a district court judge now. We had worked on and worked on to get him to convince the village to issue a business license with respect to F, and we struggled over a period of years where F was denied a business license, and finally they issued a business license, but they wouldn't issue it with respect to the remaining properties. We had lost opportunities with respect to F. This business license not only will no seller purchase the property, but no finance company will look at you if you don't have a so-called business license from the village. They were holding it hostage. Once that license was issued as to F, we were within a fairly short period of time able to sell the property, and while it was for $16 million, there was considerable debt with respect to the property, not just the mortgage, but underlying debt to the underlying members that had held that property since 1989. So the jury found, based on the evidence presented at the trial, that the business license had been wrongfully withheld, Mr. Mick being the policymaker with respect to that business license, as to all three properties. Right, and just to cut to the chase, one expert said the sale price was too low, and another, the defense expert, said it was accurate and just exactly the right price, and the jury was entitled to accept the defense expert on that, while adopting a different measure of damages for the harm to Area G, and then yet another different measure of damages for the harm to the Area H. I mean, it's certainly a rational way to proceed. You can't say it's irrational. Well, I think that it's rational to proceed with respect to F, that there could have been, but G and H were in the identical position. The reason the court cited with respect to the electric ordinance made no sense. It's not consistent with the jury's verdict that it is Mr. Mick, the policymaker, with respect to issuance of the business licenses, and not Mr. Karestas. Well, right, but the jury could accept the appraisal versus outstanding debt measure for one area and reject it for the third area without calling into question the factual basis for that, because there was evidence on both sides, and they could pick one measure for one area and another measure for the other. If in fact there had been no finding of liability, particularly with respect to H, as I understand it, for nominal damages is when there's in fact a liability harm that's caused, but no damages have been proven, and the district court has to look to see whether damages were proven. Here, the identical type of proof was submitted particularly as to H. Right, but the jury couldn't reject that for Area H and say it's nominal damages at best, so we'll award a dollar. But what was proven was the exact same proofs they adopted with respect to G. What's proven is what the jury says is proven, so as I read this verdict, the jury said no. Nothing more than nominal damages were proven in terms of the degree of harm to Area H, so all you get is a dollar. Well, I think that the form, and the fact that the court recognized that the way they determined G was using the identical form. Consistency there, but inconsistent verdicts are okay in civil cases. We believe instead that the flow of funds argument, the introduction of wealth, the extraneous comments that permeated the trial about wealth, when the court in fact found and granted the motion in limiting with respect to wealth, but they were able to get around or circumvent that through this flow of funds argument, that that inflamed the passion of the jury decided, well, we're going to give you damages here, but even though there's an identical damages that were presented with respect to H, and they are virtually the identical properties. Okay, that's a different sort of category of argument than your challenge to the reasonable basis for the damages. So you've moved back to your argument that this evidence of Mr. Clapper's wealth was inappropriately admitted. We believe that the damages with respect to H, if you look at the verdict as a whole, and if you look at that verdict and look at the other findings, the findings of punitive damages, and the findings of punitive damages against Mr. Mick, and initially against Mr. Karestas, the conspirator that the court rejected, that they wouldn't have awarded punitive damages if they didn't think the serious harm had been caused and didn't want to send a message to Mr. Mick with respect to the not issuing to the business class. Well, serious harm to the sale of Area G. No, because the punitive damages were awarded to all three parties. They were awarded to G, H, and F. So it's hard to reconcile that they were punishing them, wanted to go the extreme measure of awarding punitive damages against Mr. Mick based on liability, and then also say, well, they thought there were no damages. In fact, we think that the evidence presented that a nominal damage award was inappropriate in this circumstance given the proofs that had been submitted and the reasoning provided by the court that it, the only, the plausible argument was that it was because there was a difference in electric doesn't make any sense because not only Mr. Mick was found individually, and he was a policymaker with respect to business licenses, but also that the, also that the issuance of a business license, the finding of liability, the, whether it was based on electric or otherwise is a finding of liability, whether it had an electric ordinance, and that caused them not to issue business licenses, that caused them to go into foreclosure, is an issue of liability, and the jury found liability. The difference in electric license or no electric license doesn't have anything to do with damages. Damages in fact were presented, and they were presented in an identical fashion from the same parties. It's not like they were going to believe Wachovia in the CBRE appraisal on one, the mortgage amounts were a matter of fact, and not believe the exact same appraiser doing an appraisal on H, and from the same Wachovia, and those foreclosure letters were sent within days of each other, if not on the same day. So it's not like there's a passage of time, it's not like, and again we're talking about identical properties other than some minor cosmetic differences. I wanted to turn to the issue of attorney's fees. The court went through a load start, determined that we were properly determined that all three properties were prevailing parties to the extent that there was a finding of liability. It went through a load start and changed the calculation slightly. I think we were asking for attorney's fees and costs of $1.6 million, and the court determined I think it was roughly $1.3 million of fees and costs that would be allowed by going through and doing an analysis of time spent and whether it was duplication and things like that. We don't contest that in terms of the court's calculation as to the load start, but what we do contest is that the court then simply mathematically created a ratio. It says, well, you had a finding of liability on one, but you had two others, I'm sorry, you had a finding of liability on all three, all three are prevailing parties, it's a federal claim, ignored the fact that punitive damages were awarded to all three, which by itself is a factor that I understand weighs heavily in favor or presumption of awarding attorney's fees, because it satisfies the public policy aspect. But in addition to that, the court ignored that you were dealing with the same core facts. You had three cases that were consolidated for purposes of discovery. Three cases that were consolidated for purposes of trial. The facts that had to be seen. Thank you, counsel. Thank you. Anything further, Mr. Hardigan? Briefly, Judge. This all started with Area G. The village cast the first stone by filing a simple complaint for code violations and ordinance violations in Chancery Court. That was removed. It's a federal court, where Judge Norgal was the judge who received that case, and off we go in 2008. So this all started with Area G. So to say that Areas G and H are identical in all respects, well, it may be true from the outside, but that's like saying two houses on the same block, two bungalows, for example, are identical in nature. They may differ very much when you go inside. And that is what the testimony showed, that Area G was neglected, but they claimed it was because we stopped performing inspections. They couldn't get the money to improve the properties. They couldn't put people in these units, and as such, they walked away from the property because it was a non-recourse loan and there was no adverse consequences. It's all the village's fault. So to say that Area G and H are identical is to ignore all the differences that were presented at an 11-day time to trial, where 30-some-odd witnesses testified before a jury that had to listen to it all. And I identified the differences between Areas G and H because Judge Feinerman admittedly didn't put a whole lot into it, but he did say the evidence was received differently for each property, and he agreed with our position that it was indeed different. So the jury heard that all this litigation, like I said, began when we filed the first case in state court. That state court action was then remanded by Judge Norgal back to state court. Plaintiffs' federal claims remained here. That state court action was continually prosecuted by village counsel, and Judge Marion Mason, who's now a appellate court judge, sanctioned the village for essentially litigating a losing case. We fought to keep those sanctions out. Judge Feinerman said it's probative, more probative than prejudicial, and that the jury should hear about that. That only relates to Area G. So now we've got the village being sanctioned by a totally different judge for going after Thorn Creek. We didn't prosecute or go after Area H. We had no problem with H. The jury heard all about this electoral ordinance, and they heard probably well more than they should have about this electoral ordinance, which simply called for an upgrade from 60 to 100 amp pure service upon a change of occupancy. That was talked about at length, as if that ordinance was enacted specifically to target Thorn Creek, to drive them out of business. That didn't apply to Area H. So the jury heard countless testimony about that rather mundane issue that turned out to be perhaps the reason why the jury awarded the way they did, and there was some evidence that the village gave an extension of time to a competitor, Andrew Brown, to bring his properties up to the electrical ordinance when Thorn Creek was not given that type of extension. They didn't ask for it. They just said, we're not going to do it. And then, again, there was no interested buyer identified for Area H. No one said, hey, you know what? I want to buy Areas G and H. It was only G. And so the jury heard testimony, I believe, from Mr. Clapper that he had a friend in Michigan who was ready to buy this property, and he was scared off because the village was so mean to him, and he didn't want to do business with them. I mean, that's really what it was. So there was all types of reasons why the jury may have awarded for only G. Again, we don't know how it arrived at that number, which dovetails into my argument that a number may have very well included prejudgment interest. And any confusion in that regard should be held against the party requesting prejudgment interest. I want to talk about the pre-2005 documents, only because I was involved in that back in 2008 with Magistrate Judge Schenker when I said, oh, wait a minute. These requests are too broad. Let's limit it from 2005 to the present, the statute of limitations issue. 2005, incidentally, is when Tom Mick took office. As village manager, certainly things started to become more tense between the village and Thorn Creek at that time. There's no question about that. So Magistrate Judge Schenker said, fine, requests for documents that predate 2005 are out. You can request anything from 2005 to the present. There's nothing that said that the parties can't disclose documents that predate 2005, and that's what we did. And plaintiffs did that as well. I was given a $10,000 document, a 10,000-page document dump in 2008 saying, you know, here's everything, and it included documents that went back to 1989. So what this is really about is that we had to present a flow of funds argument. That's how we attack damages. This isn't a personal injury suit or a wage loss claim. This was, where did the money go? And that was what we had to do to defend ourselves. So liability aside, if the jury got to liability, which they did, we need to attack damages. And that's what we did with Michael Pachter, who provided opinions that after he reviewed all the documents that were put before him, he saw no evidence of damages, and this is where the money went. So to suggest that also, as counsel suggested in briefs, that their expert was unrebutted, their opinions were unrebutted, simply it's silly because they ignore Michael Pachter and his opinions. As far as attorney's fees are concerned, we didn't dispute that they were prevailing parties. That was obviously admitted in our briefs. There's no dispute regarding number of hours, the attorney hourly fee, and we didn't argue that Area G's award was nominal. There's all kinds of argument in the brief that we said that. We didn't argue that. We said that the fee should be reduced more than what Judge Feinerman did, but in this case, he appropriately reduced based on the overall degree of success, which in this case was 7.6% of their claims. Look at page 24 of my cross appeal where I create a table which outlines how they did, what they received in comparison to what they requested, 20.5 million, they got 2 million in change. They requested hundreds of thousands of dollars in punitive damages and got $6,000. And there was two nominal damage awards. So all those factors came into play. And Judge Feinerman also considered the three Farrar factors, which I won't get into, but he found that those three factors militated strongly against an award of attorney's fees. So as much as it pains me to say this, I respectfully request that the court affirm the award of attorney's fees for Thorn Creek in the amount of $430,999.25 in non-taxable expenses and $44,844.33 and find that it was not an abuse of discretion to slash the attorney's fees as he did. One more minute. As far as the wealth of David Clapper, if you look at the motion to eliminate, he wanted to keep out things such as where he vacations, who his girlfriends are, and his personal tax returns. All those things were done. In 2007, Thorn Creek 1 was a pass-through through Schedule E, and that was permitted into evidence.  We were allowed to talk about the 2007 tax returns, and to say flow of funds, Mr. Clapper is Thorn Creek. There's no question about it. He's the only one that testified on behalf of Thorn Creek. Others testified on behalf of the management company, but he is the face of Thorn Creek. And any alleged violations of the motion to eliminate were properly cured and addressed by the district court, as more fully explained in Judge Feinerman's memorandum of opinion and order. For all these reasons, we respectfully request that this court vacate the prejudgment interest award, finding that it was of an abuse of discretion award, that amount, as it was baked in the cake. That amount was very well included in the general verdict, which, again, was submitted to the jury without objection. The court should not have entertained a post-trial request for that. We also request that this court vacate the 1985-3 claim against Tom Mick and the subsequent punitive damage award. If he was indeed acting in his official capacity, then that's a punitive damage award against an official policymaker, which, under the city of Newport, should not be allowed, no punitive damages against the municipality. And we respectfully find that this court affirmed the district court's opinion with respect to all the evidentiary findings and the attorney's fees. Thank you. Thank you very much. The case is taken under advisement.